***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award, except for modifications. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. PMA Insurance Company is the carrier on risk.
4. Plaintiff's average weekly wage was $590.00, yielding a compensation rate of $393.35.
5. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
6. Industrial Commission Forms and filings relating to this case were stipulated into evidence as Stipulated Exhibit 2.
7. Copies of compensation checks were stipulated into evidence as Stipulated Exhibit 3.
8. Discovery responses relating to this case were stipulated into evidence as Stipulated Exhibit 4.
9. A Summary of wages earned for Rogers Sons Welding Company was stipulated into evidence as Stipulated Exhibit 5.
10. The issues are: (i) whether plaintiff is capable of returning to work; (ii) whether plaintiff has earned wages since January 18, 2000, entitling defendants to a credit for overpayment of compensation; (iii) whether plaintiff has reached maximum medical improvement, requiring him to make an election as to benefits; (iv) whether plaintiff has refused work within his restrictions; and (v) whether plaintiff's right knee is related to his compensable injury by accident?
 EVIDENTIARY RULINGS
The objections raised in the depositions of Randy L. Adams and William L. Griffin, M.D., are OVERRULED.
 ***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 59 years old and had completed the 12th grade. He had worked for Industrial Maintenance Overflow (IMO) off and on for the last 20 years, and continuously for the last 10 years (May 1989 to November 1999).
2. Plaintiff was employed as an ironworker who set up cranes and rigging for the installation of telephone towers and equipment. Plaintiff's duties included welding, rigging, heavy lifting, regular climbing, stooping, bending, squatting, and walking.
3. On October 30, 1998, plaintiff suffered an admitted injury by accident at work when a 20-ton piece of equipment "broke loose" and "hit" him against a brick wall, injuring both his knees. The tongue of the dolly struck the left side of plaintiff's left knee and smashed him against the wall. Plaintiff went to St. Joseph's Urgent Care the next day and was immediately referred to Blue Ridge Bone and Joint Clinic, an orthopaedic group, for further evaluation.
4. James Weilbaecher, M.D., who had handled an earlier rotator cuff surgery for plaintiff, initially treated plaintiff's knee injury. An immediate diagnosis of a left knee ACL tear resulted in a December 8, 1998, surgery for lateral and medial meniscus repair, anterior cruciate ligament, and removal of a loose body by Dr. Weilbaecher at St. Joseph's Hospital in Asheville, N.C. After a short return to work, medical attention was turned to plaintiff's right knee injury. After a March 3, 1999, MRI confirmed a torn medial meniscus tear in the right knee, David Cappiello, M.D. (who took over for retired Dr. Weilbaecher) performed a surgical repair of the medial meniscus tear on March 17, 1999, at St. Joseph's Hospital.
5. Plaintiff returned to light duty work in April, 1999, and continued working light duty from that date until November 10, 1999. He was generally permitted to work within his ongoing medical job restrictions of no squatting or climbing. Plaintiff was usually able to handle his job duties in this admittedly accommodated work position. Defendants did not require him to perform any climbing or other job duties that exceeded his existing restrictions. Defendants conceded that the job was not available to the general public in an undated note that read:
 Mr. Hensley was on Workers Comp [sic] due to a knee injury. We had been accommodating Mr. Hensley with work that he was able to do according to his Doctors instructions . . . (emphasis added).
6. On November 10, 1999, plaintiff quit the light duty job after his boss accused him of stealing time by improperly filling out time cards. When asked during discovery (Interrogatory 12) as to whether plaintiff's position was still offered to him, the defendants responded:
 No, because that job is no longer available. Due to a downsizing, his job was not filled and is no longer there. He was hired to work with the cranes and that department has been reduced (emphasis added).
7. Following the dispute with IMO that led to plaintiff's separation from that job, he went to work for Jerry Rogers of Rogers' Welding for several weeks in late 1999. Plaintiff had worked with Rogers in an earlier job. Rogers testified that plaintiff could hardly climb around the trucks and onto ladders, and had considerable problems walking and working on concrete. Rogers noticed plaintiff limping when he walked. Plaintiff was not known to be a complainer or one who stayed out of work, according to Rogers. Plaintiff earned $12.00 per hour for part time work with Rogers' Welding, earning a total of $2,403.00 for the short time he worked there.
8. Plaintiff's right knee continued to bother him throughout his work attempt with Rogers' Welding in late 1999. On January 18,2000, Dr. Cappiello performed total right knee replacement surgery on plaintiff at Mission-St. Joseph's Hospital (a merger of St. Joseph's Hospital with Memorial Mission Hospital). After physical therapy and surgical recovery time, Dr. Cappiello released plaintiff from his care with a permanent restriction of no climbing. Dr. Cappiello's January 23, 2001, note contains an "addendum" prompted by an inquiry from the medical case manager in this matter that concluded plaintiff is ". . . running a mobile home park. Therefore, he is working in some capacity at this time [and] is now discharged from treatment with thirty (30) percent permanent partial disability of his right lower extremity . . . ."
9. Plaintiff began plans to develop a mobile home park in 1992, six years prior to his compensable injury. He intended to use the rents from the park to help him retire. To increase his profits, plaintiff originally planned to do most of the construction, planning, and maintenance work. The first mobile home was located in the park in June 1999, approximately eight months after his injury. Plaintiff's mobile home park is licensed by permit for 30 mobile homes, but as of the date of the hearing before the Deputy Commissioner only 19 units had been set up. Plaintiff only leases "the dirt" and does not have any responsibility for repairs or problems with the mobile homes. Income tax returns for the mobile home park reveal that plaintiff received $5,572 in gross rental income in 1999 and $25,289 gross rental income in 2000.
10. Plaintiff now has to incur additional expenses for the mobile home park operation due to his disabilities. After purchasing a hand-operated lawn mower, plaintiff turned the mowing work over to his son. Rather than take trash to the County landfill as he once could do, plaintiff now contracts that job to others. Plaintiff's son also scrapes snow for him and has taken over many other jobs related to the mobile home park maintenance.
11. Plaintiff owns a tobacco allotment. After working tobacco since 6th grade, he has been forced by his compensable injuries to lease the allotment to non-family members for the last two seasons. Prior to his knee injuries, plaintiff raised tobacco and put hay up, which he can no longer do.
12. Terry Sprouse, an acquaintance of 25 years and contractor who did the septic and water line work for the mobile home park testified that he "felt sorry" for plaintiff since his knee injuries, and did jobs (i.e., covering up septic excavation lines) that plaintiff formerly performed before his disability. Sprouse personally observed plaintiff in job sites before and after his October 30, 1998 injury. Sprouse testified he would not want the responsibility of employing plaintiff due to the likelihood of further injury and/or accidents to others. The work environments for welding and construction jobs demand a good sense of balance and unlimited ability to stand during work. Sprouse noted that plaintiff was as "strong as a bear" before his injuries and was exactly the type of worker that he sought. Plaintiff was noted to "go to sleep with the chickens at night," so he could work several jobs and give 110% to each employment. Sprouse also testified as to his personal observations of plaintiff after plaintiff's injury:
 [S]ometimes he wouldn't even come out of the house . . . [H]e'll wobble backwards. He'll always grab a hold of something and try to hang on. [There is] a big difference in the man's ability from — from [sic] then to now.
13. L. W. Gibson, plaintiff's neighbor for the last 16 years, testified that plaintiff worked hard after he got home from his regular job, prior to his injuries. Gibson stated that following plaintiff's injuries, he needed a cane to walk around his home. Plaintiff's work at his nearby mobile home park had been rare since his knee injuries. Gibson testified:
 [B]efore he had the operation, the man was working continuously . . .
 But since the operation, he has gradually declined. And I can see him walking from his house and he's limping. It looks to me like he needs a cane or crutches or other to get along with.
14. Warren Whiteside, owner of Whiteside Construction Company and an acquaintance of plaintiff for 30 years, testified he installed many of the water lines in plaintiff's mobile home park. Whiteside noted a major change in plaintiff's physical condition after the accident. He testified that instead of "spending more time working than he did anything else," plaintiff now spends "a lot of time on the porch, waving at cars as they go by."
15. Plaintiff cannot stand or walk for any sustained period of time. He stopped work on his farm in late 1999 and avoided even driving a straight drive truck due to the poor condition of his knees following the surgeries. He cannot climb or sleep for more than a few hours at a time due to his continuous and severe knee pain. Plaintiff is off his feet and resting more than half of the day. He has poor balance and is doubtful that he could ever work around heavy machines or equipment due to a fear of losing his balance and hurting others.
16. Plaintiff participated with job search activities with defendants' vocational counselor, Shelley Stowe. He made 15 to 20 job applications that he did not report to her. N.C. Vocational Rehabilitation has been consulted and has suggested only piece work possibilities at a hand skills sheltered workshop for $15.00 per day wages. Plaintiff has worked with Manpower and all other leads provided by Shelley Stowe without success in finding full or part time employment.
17. On March 11, 2002, Randy Adams, M.Ed, CVE, saw plaintiff for a vocational evaluation. Adams opined in his report:
 If Mr. Hensley's complaints of pain are considered, it is my vocational opinion that he would not be able to perform any substantial gainful activity as it may be found in the local, state or national economy. He would be considered totally disabled from work.
Adams's opinion was based on low finger dexterity, limited ability to stand or walk for prolonged periods of time and knee pain in the moderate to severe category. If pain is not considered in his vocational assessment, Adams opined that "very few" sedentary security guard positions might be considered, but at a huge loss in wages. Mr. Adams cautioned that security guard positions were only theoretical "possibilities" and not definite employment certainties. Regarding transferable skills, Mr. Adams testified:
 Q: So the maintenance work that he described he used to do at the mobile home park would exceed the restrictions of his doctors?
A: Yes.
 Q: Okay. Would he have had any transferable skills from that mobile home park work as you understood it?
 A: No. He was the owner of the mobile home park by virtue that he, this is investment for him. He saved his money and he bought it. In other words, he's kind of the self-appointed supervisor, you know. In other words there's not any real skills that would've been developed from this job or sole proprietorship that would be transferable to a system performing other work.
Important considerations elicited during Mr. Adams' testimony and evaluation of the plaintiff included:
 Q: Okay. Your finding on the Wide Range Achievement was that the verbal abilities were well below average and arithmetic ability is average. What vocational significance are those findings?
 A: Well, the verbal abilities, reading and spelling, are in the bottom 20 percentile of the population which is below average, of course, average being, starting about 33 percent to 67 percent. So this gentleman can read. He should be able to read a newspaper. He should be able to read most simple materials. However, vocationally it's significant in that this gentleman would not be appropriate for any type of clerical job which would require him to read text or write reports or deal with more technical terminology. It would just be beyond his abilities.
Q: Okay.
 A: Arithmetic is at high school level. It's at 61, 61st percentile. He has good arithmetic ability. He should be able to, to do most facets of math. He probably would not be able to perform algebra in higher levels without retraining.
 Q: And on the Purdue Pegboard you indicated he had very poor finger dexterity and opined that he would not be successful in any job that would require him to utilize his hands and fingers on a repetitive basis in manipulating small parts. Besides the obvious, what you specifically said there, what other vocational implications are the Purdue Pegboard results for Mr. Hensley?
 A: Well, particularly in a case like this when a gentleman is relegated to sedentary work; one area that I want to look for is industrial work. Almost, the great majority, well all sedentary industrial work requires the bilateral use of the upper extremities and hands on a repetitive basis. The great majority of those would require very good finger dexterity and hand dexterity in order to perform certain tasks. In industrial, sedentary industrial work that's what the employer is paying the individual to do. To produce parts, to cut, trim, inspect, assemble on a repetitive basis. Most of these jobs are done on a piece, piecework standard production basis.
 Q: Okay. So his, his low scoring on the Purdue Pegboard would eliminate some of those jobs I take it?
 A: It would eliminate the great majority of those jobs actually. Well, actually he — the score is low and he's in the bottom 10 percentile. That means 90, 90 people out of, out of 100 is going to do better than he is. Production standards are based on an average, so the average, you know, he's well below the average. He would be approximately, average being a standard score of 50; he would be about 50 percentile or 40 percentiles lower than that. He would have great difficulty performing these jobs and basically it would be setting him up for failure. If, if I were to recommend that this gentleman be placed in some type of industrial sedentary production work it would be, he would not be, he would not meet production standards and he would, well, probably be terminated.
18. A surveillance report by Advantage Surveillance was conducted over several days in January and February 2002. The results of the report are as follows:
January 14, 2002 — RH performs some outdoor activities
 January 15, 2002 — RH didn't leave house the entire day (7AM to 3PM)
 January 28, 2002 — RH didn't leave house the entire day (7:20AM to 3PM)
 January 29, 2002 — RH didn't leave house the entire surveillance (6:30AM to 9AM)
 February 4, 2002 — RH didn't leave house the entire surveillance (6:15AM to 10AM)
19. Based upon plaintiff's compensable injuries, his age, education, skills and abilities, the Full Commission finds that plaintiff is unable to earn wages in the competitive economy. The Full Commission further finds that the skills shown by plaintiff in setting up and running his mobile home park are not transferable to a job for hire and that the income he earns from the mobile home park and tobacco allotment rental is not wages but is rather investment income.
20. William L. Griffin, M.D., Charlotte Orthopedic Specialist, provided a second opinion as to plaintiff's knee on January 28, 2002.
21. Dr. Griffin indicated that plaintiff has reached maximum medical improvement and gave him a 30% percent permanent partial disability to his lower right extremity. Dr. Griffin also gave plaintiff a 40% percent permanent partial disability to his left knee. Dr. Griffin indicated that plaintiff was limited to sedentary work with no lifting over 30 pounds and no repetitive lifting; no stooping, squatting, kneeling, or climbing; and no standing or walking for prolonged periods of time.
22. Dr. Griffin is of the opinion that plaintiff will need a left knee replacement within a five year period. Dr. Griffin has indicated plaintiff's problems with his knees are related to his compensable injury by accident. The Full Commission finds that there is a substantial risk of the necessity of future medical compensation.
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. On October 30, 1998, plaintiff sustained an admittedly compensable injury by accident to his knees as result of being struck by a 20-ton piece of equipment and pushed against a brick wall. N.C. Gen. Stat. §97-2(6).
2. As result of plaintiff's compensable injury by accident, plaintiff has been receiving total disability compensation. N.C. Gen. Stat. §97-29.
3. While plaintiff did return to work for a short period of time, the job to which he returned was substantially modified and was not a job in which the general public would be employed. Plaintiff did not reject work within his restrictions. N.C. Gen. Stat. § 97-32.
4. Plaintiff remains disabled to date and shall continue to receive compensation until further order from this Commission. N.C. Gen. Stat. §§ 97-18.1 and 97-29.
5. Plaintiff's right knee injury is related to plaintiff's compensable injury by accident. N.C. Gen. Stat. § 97-2(6).
6. Defendants are entitled to a week for week credit for those weeks during which plaintiff worked for Rogers' welding. N.C. Gen. Stat. §97-42.
7. If the Commission determines that there is a substantial risk of the necessity of future medical compensation, the Commission shall provide by order for payment of future necessary medical compensation. N.C. Gen. Stat. § 97-25.1.
8. The earning capacity of an injured employee must be evaluated "by the employee's own ability to compete in the labor market. If post-injury earnings do not reflect this ability to compete with others for wages, they are not a proper measure of earning capacity." Peoples vs. ConeMills, 316 N.C. at 437, 342 S.E.2d 798, at 805-06 (1986). The employee's age, education, and work experience are factors to be considered in determining the person's capacity to earn wages. Little vs. Anson CountySchools Food Service, 295 N.C. at 532, 246 S.E.2d at 746 (1978). As held in Peoples, 316 N.C. at 438, 342 S.E.2d at 806:
 [A]n employee's earning capacity is based on his ability to command a regular income in the labor market. See Larson's Workmen's Compensation Law § 57.51(e) (1996). Thus, an employee's ownership of a business can support a finding of earning capacity only to the extent the employee is actively involved in the personal management of that business and only to the extent that those management skills are marketable in the labor market. Id. (income received from business owned by employee cannot be used to reduce a previously established disability unless the income is the `direct result of the [employee's] personal management and endeavors').
In the case at bar, plaintiff's post injury wages did not reflect his earning capacity. His age, education and work experience, coupled with the residual effects of his compensable injuries, rendered him incapable of earning wages in the competitive economy. His personal involvement in the management of his trailer park and tobacco allotment consisted primarily of collecting rent. There was no showing that there was a job in the competitive environment consisting of the minimal things that plaintiff did to collect income from his investments.
9. Lanning vs. Fieldcrest-Cannon, Inc., 352 N.C. 98, 530 S.E.2d 54
(2000) is also distinguishable from the case at bar. The test for determining whether the self-employed injured employee has wage-earning capacity is that the employee (i) be actively involved in the day to day operation of the business and (ii) utilize skills which would enable the employee to be employable in the competitive market place notwithstanding the employee's physical limitations, age, education, and experience. Id.
In the instant case, given plaintiff's exertional limitations, education, and experience, plaintiff would not likely be hired to work in the competitive market place.
All evidence of record reflects a major decrease in plaintiff's ability to perform even nominal work duties toward the mobile home park. Because the mobile home park plans predated plaintiff's compensable accident and final inability to earn wages, any income derived from that retirement project is not relevant to his earning capacity. While the initial rental income for the mobile home park occurred several months after his work accident, the initial construction, planning, and preparatory work preceded plaintiff's October 30, 1998, injury. Plaintiff's ownership of the mobile home park is analogous to ownership in stock that is hoped to appreciate in value and/or produce dividend income. Even the modest physical efforts plaintiff had envisioned putting into the project (i.e., mowing the grass, reducing costs of infrastructure by doing labor) have been diminished and/or eliminated due to his knee problems.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff shall continue to receive total disability compensation until further order from the Industrial Commission. Compensation awarded pursuant to this paragraph shall be subject to an attorney's fee approved in Paragraph 3. To the extent that defendants have not paid weekly compensation at the rate of $393.35 per week, defendants shall bring those compensation payments up to date in a lump sum together with a 10% late penalty and shall thenceforth make weekly payments of $393.35 to plaintiff with every fourth check going directly to plaintiff's attorney.
2. Defendants shall pay all medical expenses resulting to plaintiff's knees that arose from plaintiff's compensable injury by accident on October 30, 1998, to the extent that such expenses arose from treatment tending to effect a cure, lessen the period of disability, or relieve pain. Defendants shall also pay future necessary medical compensation, including but not limited to knee replacement.
3. A reasonable attorney's fee of twenty-five (25%) percent of compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel. Defendants shall pay directly to plaintiff's counsel 25% percent of the lump sum due plaintiff under Paragraph 1 of this AWARD. Defendants shall pay directly to plaintiff's counsel every fourth weekly check of compensation thereafter.
 4. Defendants shall pay the costs.
This 28th day of April 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER